UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

YUSEF ABDULLAH BILAL ALI,                )
                                          )
              Plaintiff,                  )          Civil Action No. 3:22-CV-463-CHB
                                          )
v.                                        )
                                          )          **MEMORANDUM OPINION**
LOUISVILLE METRO HOUSING                  )          **AND ORDER**
AUTHORITY, *et al.*,                      )
                                          )
              Defendants.                 )

                          ***   ***   ***   ***

        This matter is before the Court on Plaintiff Yusef Abdullah Bilal Ali's Emergency Motion

for Injunction Pending Appeal filed July 5, 2023.  [R. 37].  The Court held a telephonic status

conference on the Emergency Motion on July 6, 2023.   [R. 39].  Plaintiff and counsel for

Defendants Louisville Metro Housing Authority ("LMHA"), Lisa Osanka, and Cecillia Kelly[1]

participated in the conference.  *See id.*  For the following reasons, Plaintiff's Emergency Motion

will be denied.

    I.      **Background**[2]

        Plaintiff has resided in public housing managed by LMHA since 2019.  *See* [R. 1-1, p. 5].

The lease Plaintiff signed in August 2021 included many provisions, including the requirement

that he provide information as requested for a redetermination of eligibility, rent, or unit size.

[R. 15-7, p. 8 ¶G].  In the spring of 2022, Plaintiff resided at 2903 Six Mile Lane in Louisville,

where he began to have some issues at the property.  *See id.* at 1; *see also* [R. 15-1].

---

[1] As the Court has observed before, Defendant Kelly's first name is spelled multiple ways in the record.
*See* [R. 21, p. 1 n.1].

[2] The Court's Memorandum Opinion and Order entered in December 2022 outlined the factual history of
this case.  *See* [R. 21, pp. 2–6].  The Court restates many of those facts here as they provide a fuller picture
for the Court's analysis.

## A.    Requests for Accommodation

On March 16, 2022, Plaintiff met with Defendant Kelly, LMHA Property Manager, to discuss an incident that had occurred earlier that day between his emotional support animal (a 120-pound pit bull-Mastiff mix) and another resident's dog (a pit bull terrier).[3]  *See* [R. 15-1, p. 1]. During that meeting, Plaintiff and Defendant Kelly discussed how both dogs had been off leash and had gotten into "a brief fight."  *Id.*  Plaintiff explained to Defendant Kelly that the reason his dog was off its leash was in preparation for Plaintiff's upcoming knee surgery and Plaintiff's inability to leash the dog during his recovery.  *Id.*

Defendant Kelly informed Plaintiff that Housing Authority policy required animals to be maintained on a leash unless given a reasonable accommodation waiver, and Defendant Kelly provided Plaintiff with a waiver form for a doctor to fill out.  *Id.*  Plaintiff told Defendant Kelly that his dog had not had any incidents before, but that there was "ongoing conflict" between Plaintiff and the other resident, and that Plaintiff was concerned about the other resident's "relentless commitment to display total disregard for the safety and consideration for the other residents of this complex."  *Id.* at 2.

The next day, on March 17, 2022, Plaintiff filled out a Request for Reasonable Accommodation, in which he requested the following accommodation regarding his emotional support animal: "dog may be off leash for training purposes during surgical recovery."  *See* [R. 15-2, p. 2].  This reasonable accommodation request form listed Plaintiff's doctor's contact information for who could verify that Plaintiff had a disability and that he had need for his request. *Id.*  Plaintiff signed the form, and the record suggests the doctor's information may have been filled out by staff at the doctor's office.  *Id.*

---

[3] At the telephonic conference on July 6, 2023, Plaintiff offered that his dog was a 120-pound pit bull Mastiff mix. *See generally* [R. 39].

On March 22, 2022, Plaintiff wrote a letter to several individuals and entities, including Defendants LMHA and Director Osanka, in which he requested "immediate emergency relocation to another 'Scattered Site' Housing Unit due to safety concerns" for his emotional support animal and himself.   [R. 15-3, p. 1].   Plaintiff requested a single-family unit that would better accommodate him and his dog "during a lengthy recovery process [due] to double knee surgeries to be performed in the near future."   *Id.*   In the letter, Plaintiff described an incident that had occurred the day before involving the same resident in the prior incident and that resident's pregnant girlfriend, also a resident. *Id.* The female resident explained Mr. Ali's dog was off leash and "ran knocking her down."[4]   [R. 9-1, p. 23].   Further, this resident stated such aggression by Mr. Ali's dog had happened twice.   *Id.*   The male resident with the other dog threatened Plaintiff's dog, and Plaintiff called the police.   *Id.* at 1–2.   An officer responded to the scene but told Plaintiff it was not a crime for the other resident to threaten his dog; the same officer declined to make a report concerning the incident.   *Id.* at 2.   Plaintiff wrote that he no longer felt safe living at 2903 Six Mile Lane based on this incident.   *Id.*

On March 30, 2022, LMHA wrote Plaintiff a letter advising Defendant Kelly had requested a transfer for him and that such request was approved, but that no date for an actual move could be provided at that time.   [R. 9-1, p. 14].   On April 1, 2022, Defendant Kelly sent Plaintiff a letter explaining that no one-bedroom single family homes were available and if he sought a two-bedroom home, he would need to provide a verification form from his health care provider. Specifically, Kelly wrote: "Per our conversation, we do not have any 1BR single family homes available.   I have attached a Reasonable Accommodation Request for your health care provider to

---

[4] While it is possible the pregnant woman may have exaggerated her need for medical attention following this interaction, and LMHA theorized that she may have provided a "suspect" doctor's note, *see* [R. 40-5, p. 4; R. 41, p. 3], there does not seem to be any dispute that this was another instance where Plaintiff's off-leash dog was involved in an aggressive altercation with other residents.

consider completing.   If you have [] further concerns, please feel free to schedule an appointment . . . with me[.]" *Id.* at 12.

On April 5, 2022, Plaintiff completed a second Request for Reasonable Accommodation form, in which he checked that he was seeking an "[e]xtra bedroom."  [R. 15-4, p. 1].  Regarding "[o]ther accommodations needed," Plaintiff stated: "Single family dwelling/2 bed rooms (sic) due to Emotional Support Animal safety during Recovery following knee surgery."  *Id.* at 1–2.

On April 12, 2022, Plaintiff wrote another letter to LMHA, in which he describes a call he received from Defendant Kelly regarding his request for a single-family dwelling, during which Defendant Kelly "indicated the only thing she was waiting on was the 'doctor's signature' to approve [his] move as requested to a single family dwelling/two bedrooms."  [R. 15-5, p. 1]. Plaintiff writes that he voiced his disapproval to Defendant Kelly for this requirement because "there are numerous single individuals on the property at 2903 Six Mile Lane who occupy two bedroom apartments without any indication of medical needs."  *Id.*  In that letter, Plaintiff also references his doctor's refusal to sign a reasonable accommodation request for the single family dwelling: "I went down to [the doctor's] office to be informed that he would not sign such a request without speaking with me or any understanding of my living conditions."  *Id.*  Plaintiff failed to provide such documentation and failed to provide any factual support that he ever followed up on his physician's request for additional information.[5]

On April 13, 2022, Plaintiff spoke with Jennifer McNeill, Public Housing Ombudsman for LMHA.  *See* [R. 1-7].  An email McNeill sent to Plaintiff memorializing their conversation listed the items discussed as follows:

- Have spoken with PM Kelly regarding "reasonable accommodation"

---

[5] Without any support, Plaintiff also expressed his "belief that Mrs. Kelly and the doctor discussed my medical situation in violation of my medical privacy to insure [sic] that I would not be accommodated." [R. 15-5, p. 1]. Nothing in the record supports this accusation, and the Court will not consider it.

- Will be having knee surgery (on both knee different times) and will not be able to walk/let emotional support animal out to relieve/exercise.
- Need a secured yard/area to let emotional support animal off lease to relieve/exercise.  Do not need a two bedroom.
- Current place require him(Y.Ali) to walk a min. 150 feet away in order to take emotional support animal to relive/exercise.
- PM Kelly has created a hostile environment for him(Y.Ali).

*Id.* at 2 (verbatim).

On April 29, 2022, LMHA general counsel wrote Plaintiff a letter regarding "Collaborative Process Regarding Request for Reasonable Accommodations."  [R. 15-6, p. 1].  In that letter, the general counsel summarized the two accommodations Plaintiff requested for his recovery from anticipated knee surgery: (1) "Immediate transfer from your current unit at 2903 Six Mile Lane to a single-family unit"; and (2) "Permission to keep your support animal 'off leash for training purposes.'"  *Id.*

Regarding the first request, LMHA general counsel stated that LMHA was willing to arrange Plaintiff's immediate transfer to another scattered site housing location as soon as a suitable unit became available.  *Id.*  Counsel explained, "Unfortunately, there is an issue with your request for a single-family unit [because] LMHA only has single-family units with two bedrooms or more. As the sole member of your household, you currently do not qualify for a two-bedroom unit."  [R. 15-6, pp. 1-2].  LMHA explained it could only place him in a two-bedroom, single-family unit "if you can provide a doctor's statement that it was necessary to accommodate your disability."  *Id.* at 2.  In the absence of such information, LMHA could only offer transfer to a one-bedroom unit.  *Id.*  According to the defendants, Plaintiff never followed up with LMHA regarding the accommodation request and did not provide the required doctor's statement; he also did not accept transfer to a one-bedroom unit.  *See* [R. 15, pp. 3, 8].

Regarding the second request, LMHA was unable to grant Plaintiff permission to keep his support animal off leash on its property.  [R. 15-6, p. 2].  The letter stated: "Your support animal has a documented history of aggressive behavior toward LMHA residents and staff as well as other animals.  Allowing you to keep the animal off leash would violate local ordinance and pose an unacceptable risk of harm to others[.]" *Id.*  The letter concluded: "LMHA wants to work with you collaboratively to identify potential alternative accommodations to meet needs.  If you are interested, please contact me to arrange a meeting for this purpose." *Id.*  The record does not reveal that Plaintiff ever requested such a meeting.

### B.      Annual Recertification Process

Separate from the accommodation requests, the record contains extensive facts concerning Plaintiff's refusal beginning in the summer of 2022 to complete recertification documentation required for his continued living in public housing.  *See* [R. 15, pp. 3–5; R. 21, pp. 4–6].  Importantly, to comply with federal regulations, Plaintiff's lease included a standard provision applicable to all residents stating: "[t]he resident agrees to furnish accurate information and certifications regarding family composition and income as may be necessary to make determinations with respect to rent, eligibility and appropriateness of dwelling size, on an annual basis or as requested by Management."  [R. 15-7, p. 8, ¶ G].  Section L-2(e) further provides that the lease may be terminated for "failure of the resident to supply to management, in a timely fashion, any certification, release, information or documentation on family income or composition needed to process annual, biennial, or interim redeterminations for rent." *Id.* at ¶ L-2(e).

On June 16, 2022, LMHA sent Plaintiff a letter instructing him to complete and return several attached recertification forms and to appear for a recertification interview.[6]  [R. 15-8, p.1].

_____

[6] The Court's recitation of the facts regarding Plaintiff's actions in relation to the recertification process is drawn largely from its prior Memorandum Opinion and Order.  *See* [R. 21, pp. 4–6].

In response to the letter, on June 27, 2022, Plaintiff sent a "Notice to Cease and Desist" to LMHA's counsel in which Plaintiff stated that he received the letter from LMHA shortly after filing a complaint against LMHA with the United States Department of Housing and Urban Development ("HUD").  [R. 15-9, p. 1].[7]  Plaintiff asserted: "[LMHA] and its representatives are retaliating against complainant for ongoing complaints seeking an unlawful means of an illegal eviction in violation of both state and federal law."  *Id.* at 1–2.  Plaintiff advised: "If this Activity continues I will immediately seek a temporary restraining order in the Western District Courts against you and any accomplices in this matter."  *Id.* at 2.

On July 6, 2022, LMHA's counsel responded to Plaintiff by letter, stating:

You allege in your letter that LMHA is attempting to evict you from the above-listed dwelling unit in retaliation for a complaint you recently made to HUD about living conditions at your apartment complex. You may be assured that this is not the case.

LMHA is not trying to evict you or otherwise retaliate against you for any reason and only learned of your complaint to HUD when you disclosed the same in your above-referenced letter.

The public housing eligibility recertification packet that you received from LMHA on June 24, 2022 is part of the routine eligibility recertification process that all LMHA tenants must complete annually.  It is the same recertification packet that all LMHA residents receive each year and is totally unrelated to your HUD complaint.

[R. 15-10, p. 1].  According to Defendants, "Plaintiff did not respond to this letter, and he took no further action to schedule a recertification interview."  [R. 15, p. 4].

On August 2, 2022, LMHA sent Plaintiff a second request for him to complete recertification documents.  [R. 15-11].  On August 24, 2022, LMHA sent a "final notice" directing

---

[7] On May 2, 2022, Plaintiff filed a claim with HUD, though it appears HUD advised Plaintiff it lacked jurisdiction for his claim and directed him to contact the Kentucky Commission on Human Rights.  [R. 1-2; R. 1-5].  The Court could find no indication in the record that Plaintiff contacted the state agency.

Plaintiff to complete the recertification process within seven days.  [R. 15-12].  Plaintiff did not timely comply, and instead filed this action.  [R. 1].

Through his Complaint, filed September 2, 2022, Plaintiff maintains that Defendants failed to provide him with reasonable accommodations, namely a two-bedroom apartment and the ability to keep his emotional-support animal off leash, which prevented him from being able to have knee replacement surgery.  *See* [R. 1, p. 5 ("On two separate occasions Plaintiff submitted a Reasonable Accommodations request relating to him having knee surgery on March 17, 2022 and April 5, 2022 with numerous letters.  Defendants denied Plaintiff Reasonable Accommodations Request in violation of the Fair Housing Act, Civil Rights Act, because Defendants have provided such accommodation for similarly situated persons.") (verbatim)].  Plaintiff cites many sources of federal and state law in support of his claims.[8]  [R. 1-1, p. 2].  He seeks injunctive and declaratory relief, as well as compensatory and punitive damages.  *See* [R. 1, p. 6].  Defendants filed their Answer on September 27, 2022.  [R. 6].

On September 30, 2022, due to Plaintiff's failure to comply with the final notice, LMHA sent Plaintiff a letter labeled "30 Day Lease Termination Letter with 'Right to Cure.'"  [R. 15-13, p. 1].  That letter advised:

> Your lease is being terminated on the grounds that you have not kept your required appointments in order to supply to management, any certification release, information, or documentation on family income or composition needed to process annual redetermination for rent. . . . In order to avoid the termination of your lease you must remedy the conditions of the violation described above within thirty (30) days from the date of this letter.

---

[8] Plaintiff has filed two motions in which he seeks to supplement or amend his Complaint.  *See* [R. 12; R. 35].  Given Plaintiff's appeal, these motions are not presently before the Court.  *See* [R. 22].  Nonetheless, the Court observes that the allegations contained within those motions (or proposed amended complaints) parrot those alleged in Plaintiff's original Complaint.

*Id.* On November 17, 2022, LMHA sent Plaintiff a notice again requesting that Plaintiff complete the required recertification process, and also offering to refer Plaintiff to an Eviction Diversion Program in an effort to avoid terminating Plaintiff's lease.  [R. 15-14].

Plaintiff did not respond to the offer, and instead, on November 21, 2022, filed a Motion for Temporary Restraining Order and Preliminary Injunction.  [R. 9].  The Court denied Plaintiff's request for a TRO, noting that no immediate harm was apparent from the record because the defendants intended to work with Plaintiff to prevent eviction, and ordered Defendants to respond to the motion for a preliminary injunction.  [R. 10].  In their response, the defendants stressed that they did not wish to evict Plaintiff, but instead merely wanted him to sign standard documents that were a requirement of his lease.  [R. 15].

After consideration, on December 12, 2022, the Court denied Plaintiff's motion for a preliminary injunction, finding that he could show neither irreparable harm nor a likelihood of success on the merits.  [R. 21].  Four days later, on December 16, 2022, Plaintiff filed a notice of appeal "from the order denying Plaintiffs' Preliminary Injunction Order entered on the 12th day of December 2022 by Honorable Judge Claria Horn Boom."  [R. 22].  The same day, Plaintiff filed another motion for preliminary injunction.  [R. 23].

In March 2023, several months after Plaintiff filed his Notice of Appeal, the parties participated in a settlement conference with United States Magistrate Judge Regina S. Edwards. [R. 32].  The Court appointed counsel to represent Plaintiff during the settlement conference. [R. 29].  However, the parties were unable to reach a resolution.  [R. 32].

A few weeks after the settlement conference, the defendants requested a telephonic status conference with Magistrate Judge Edwards.  *See* [R. 33].  During that conference on May 1, 2023, defense counsel represented that Plaintiff had made a death threat against an employee, while

Plaintiff "emphatically denied making threats and expressed concerns of perceived ongoing harassment." *See* [R. 34].  Magistrate Judge Edwards emphasized to the parties that "these matters fall outside the scope of the instant action" and that any further status requests should be made to the Court in writing.  *Id.*

On May 23, 2023, LMHA filed a petition for writ of forcible detainer in Jefferson District Court.  *See Louisville Metro Housing Authority v. Ali*, No. 23-C-006649 (Jefferson Dist. Ct. May 23, 2023) (Petition for Writ of Forcible Detainer).[9]  On July 3, 2023, a forcible detainer judgment was entered against Plaintiff in that action, ordering Plaintiff to vacate the property within seven days.  [R. 37-2, p. 2].  Plaintiff has appealed the forcible detainer judgment in the state court proceedings.[10]  [R. 37-1].

On July 5, 2023, Plaintiff filed his Emergency Motion for Injunction Pending Appeal. [R. 37].  Through his Emergency Motion, Plaintiff seeks to enjoin the "ongoing and/or imminent eviction process of Plaintiff from the dwelling at 2903 Six Mile Lane." *Id.* at 1.  The Court held a telephonic hearing on the Emergency Motion on July 6, 2023, during which the Court heard from Plaintiff and defense counsel.  *See* [R. 38].  At the conclusion of that hearing, the Court stated that it would give Plaintiff an opportunity to supplement his motion and that it would issue an opinion in short order.  *See id.*

---

[9] During the telephonic status conference on July 6, 2023, defense counsel listed four reasons LMHA sought to evict Plaintiff: (1) threatening behavior against a LMHA employee; (2) failure to pay rent in more than a year; (3) failure to complete the recertification process; and (4) failure to permit individuals in his home to make repairs.  *See generally* [R. 39]; *see also* [R. 37-2].  The Petition for Forcible Detainer cites specifically to Plaintiff's alleged harassment and threatening of LMHA staff, service providers, and tenants. *See Louisville Metro Housing Authority v. Ali*, No. 23-C-006649 (Jefferson Dist. Ct. May 23, 2023) (Petition for Writ of Forcible Detainer).

[10] During the Court's telephonic hearing on July 6, 2023, defense counsel represented that Plaintiff's state court appeal would stay his eviction.

The next day, on July 7, 2023, Plaintiff filed a motion to supplement his Emergency Motion.  [R. 40].[11]  Defendants responded to Plaintiff's motion to supplement, arguing that the documents he filed do not demonstrate a likelihood of success on appeal and that Plaintiff's Emergency Motion should therefore be denied.  [R. 41].  As an administrative matter, the Court will grant Plaintiff's motion to supplement [R. 40] and will proceed to consider the merits of his Emergency Motion below.

## II.    Legal Standard

Through his Emergency Motion, Plaintiff essentially asks the Court to stay its prior decision denying his motion for a preliminary injunction.  *See* [R. 21].  Such a request is governed by Federal Rule of Appellate Procedure 8(a) and Federal Rule of Civil Procedure 62(d).   In determining whether a stay should be granted, the Court considers essentially the same factors that are used in evaluating a request for a preliminary injunction:

> These well-known factors are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.  *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n,* 812 F.2d 288, 290 (6th Cir. 1987); *see also Hilton v. Braunskill,* 481 U.S. 770, 776 (1987) (factors are the same under Fed. R. Civ. P. 62(c) and under Fed. R. App. P. 8(a)).  These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together.

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *see also Ent. Prods., Inc. v. Shelby Cnty.*, No. 08-2047, 2008 WL 11411138, at *1 (W.D. Tenn. Apr. 29, 2008) ("Under Rule 62, when an appeal is taken from an interlocutory judgment denying

---

[11] The Court notes that the documents in R. 40 are repeats of documents filed previously in the record, or otherwise do not tip the balance of the Court's analysis.  *See* R. [1-1 to R. 1-9 to R. 9-2; R. 15-1 to R. 15-14]; [R. 41 (explaining Plaintiff's confusion in alleging that Defendants scrutinized Plaintiff's medical request as potentially fraudulent when Defendants were discussing a medical note from a different resident)].

an injunction, the district court may issue an injunction pending appeal. . . . Generally, the four factors that the Court must weigh are the same as those considered in analyzing a motion for preliminary injunction").  Plaintiff, as movant, bears the burden of showing that a stay is warranted under the circumstances of this case.  *See Memphis A. Philip Randolph Inst. v. Hargett*, 977 F.3d 566, 568 (6th Cir. 2020).

### III.    Analysis

#### A.  Irreparable Harm

The Court's prior Memorandum Opinion and Order entered in December 2022 denied Plaintiff's original Motion for Temporary Restraining Order and Preliminary Injunction on two grounds: failure to demonstrate irreparable harm and failure to demonstrate likelihood of success on the merits.  First, the Court held there was no imminent and irreparable injury at the time because LMHA had repeatedly assured Plaintiff it had no intention of evicting him and continued to work with Plaintiff to explain the recertification process to Plaintiff, which was required of all residents.  [R. 21].  Although LMHA has since obtained a forcible detainer judgment against Plaintiff, [R. 37], that action, filed several months later on May 23, 2023, was based on new allegations, including Plaintiff's alleged threats to Ms. Kelly, failure to pay rent for over a year, and other developments.  *See supra*, section I.B., p. 10, n.9; [R. 37-2]; *Louisville Metro Housing Authority v. Ali*, No. 23-C-006649 (Jefferson Dist. Ct. May 23, 2023) (Petition for Writ of Forcible Detainer).  The Court notes that at the time of its irreparable injury ruling in December 2022, Plaintiff had failed to demonstrate irreparable injury under the facts and allegations at the time.

Because Plaintiff's current Emergency Motion follows the forcible detainer judgment being filed against him in state court on July 3, 2023, [R. 37], the Court finds the irreparable harm element has now been satisfied because Plaintiff faces imminent eviction, [R. 37-2], and "[a] loss

of housing constitutes an irreparable harm." *Watkins v. Greene Metro. Hous. Auth.*, 397 F. Supp. 3d 1103, 1109 (S.D. Ohio 2019); *see also White v. US Bank N.A.*, No. 17-cv-02671-JPM-dkv, 2017 WL 10311423, at *2 (W.D. Tenn. Oct. 11, 2017) (citing *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Cap., Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001)) ("As to eviction, White is correct that loss of a unique property interest is considered irreparable harm.").  However, even though the irreparable harm factor is now met, Plaintiff still cannot demonstrate a likelihood of success on the merits.

### B. Likelihood of Success on the Merits

In its prior Memorandum Opinion and Order entered in December 2022, the Court provided abbreviated discussion of the second ground for denial—the likelihood of success factor—because the irreparable harm element was not satisfied at that time.  *See* [R. 21, pp. 8–11 (citing *Memphis A. Philip Randolph Inst.*, 978 F.3d at 391 ("Irreparable harm is an indispensable requirement for a preliminary injunction, and even the strongest showing on the other factors cannot justify a preliminary injunction if there is no imminent and irreparable injury.") (internal quotation marks omitted))].  Notably, nothing Plaintiff has provided in his Emergency Motion, as supplemented, changes the calculus for the Court to find that he has a likelihood of success on the merits for his claims on appeal.  A review of Plaintiff's claims proves this point.

In his Complaint, Plaintiff describes his claims as follows:

> disability discrimination, racial discrimination, gender discrimination, age discrimination, failure to reasonably accommodate, failure to engage in the interactive process, and retaliation of Kentucky's Civil Rights Act of 1968 (KCRA); unlawful business practices in violation of Kentucky's Unfair Business Practices KRS§367.170, American with Disability Act 1990 42 U.S.C. § 12101[.]

[R. 1-1, p. 2 ¶1].  As a preliminary matter, Plaintiff has provided only cursory allegations regarding any racial, gender, or age discrimination.  These claims therefore have no likelihood of success on

the merits. *See generally McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (cleaned up).

As to the other claims, Plaintiff cites many sources of law and phrases his claims in different ways.[12]  The first three claims listed in his complaint are for disability discrimination, [R. 1-1, pp. 6–8]; failure to accommodate, *id.* at 8–9, and failure to engage in the interactive process, *id.* at 9–10. The allegations of each of these three claims overlap. For example, Plaintiff's first claim for disability discrimination specifically references a landlord's obligation to provide reasonable accommodations to tenants with disabilities and to engage in an interactive process with residents to determine appropriate accommodations.  *Id.* at 7.  In that same claim, he argues that the defendants denied him a reasonable accommodation and failed to engage in an interactive process with Plaintiff.  *Id.*  These allegations directly overlap with Plaintiff's allegations in his claims for failure to accommodate, *id.* at 8–9, and failure to engage in the interactive process, *id.* at 9–10.  The Court, therefore, understands that Plaintiff's disability discrimination claims are actually claims for failure to accommodate and for failure to engage in the interactive process.[13] In addition to these two claims, Plaintiff also raises a retaliation claim, *id.* at 10–11, and a claim

---

[12] The Court observes that Plaintiff cites several sources of law that have nothing to do with the facts of this case.  For example, he cites Title IV of the Civil Rights Act as supporting his claims, but that statute applies to public schools.  [*See, e.g.*, R. 1, p. 4].  The Court understands that Plaintiff is proceeding *pro se* and has therefore attempted to discern the nature of his claims.

[13] Typically, under either the federal or state scheme, a plaintiff can allege disability discrimination under three theories: discriminatory treatment, discriminatory effect, or failure to make a reasonable accommodation.  *Anderson v. City of Blue Ash*, 798 F.3d 338, 360 (6th Cir. 2015).  Based on the allegations in the Complaint, the Court understands that only the third theory (failure to accommodate) is implicated here.

for unlawful business practices, *id.* at 11. The Court considers each of Plaintiff's four claims in turn.

### 1. Failure to Accommodate

In his first claim for relief, Plaintiff alleges disability-based discrimination in violation of federal and state law. *See id.* at 6–7 (citing the Fair Housing Act ("FHA"), the Americans with Disabilities Act ("ADA"), and the Kentucky Civil Rights Act ("KCRA")).[14] As a foundational matter, both federal and state law prohibit discrimination against someone with a disability within the context of public housing. *See, e.g.*, 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."); KRS § 344.360 (listing unfair housing practices). For example, the FHA, as amended, "makes it unlawful to 'discriminate against any person . . . in the provision of services or facilities in connection with [a] dwelling[ ] because of a [disability] of . . . a person residing in . . . that dwelling.'" *Kooman v. Boulder Bluff Condos.*, 833 F. App'x 623, 626 (6th Cir. 2020) (quoting 42 U.S.C. § 3604(f)(2)). This provision prohibits discrimination based on, among other things, "a failure to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).[15] The ADA similarly prohibits discrimination against a

---

[14] Courts consider discrimination claims under these various statutes in tandem based on the similarities between the laws. *See Forziano v. Independent Group Home Living Program, Inc.*, 613 F. App'x 15, 18 (2d Cir. 2015) (discussing similarities between the FHA, ADA, and Rehabilitation Act for intentional discrimination claims); *Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 3:16-cv-00466, 2017 WL 3605381, at *1 n.2 (S.D. Ohio Aug. 22, 2017) (citing *Forziano*, 613 F. App'x at 18) ("Because of the similarities between disability discrimination claims under the FHA and ADA, references herein to the FHA speaks to the ADA as well."); *see also generally Dinter v. Miremami*, 627 F. Supp. 3d 726, 730–31 (E.D. Ky. 2022) (discussing similarities between the FHA and KRS § 344.360(9) [KCRA] in context of failure-to-accommodate claim).

[15] The FHA also covers other forms of disability discrimination not relevant here, such as the failure to design or construct a dwelling such that the public and common use areas are readily accessible and usable by handicapped persons. 42 U.S.C. § 3604(f)(3)(C)(1).

person with a disability and requires reasonable accommodations.  *See* 42 U.S.C. § 12132; *see Cardona v. Community Access, Inc.*, No. 11-CV-4129, 2013 WL 304519, *7 n.9 (E.D.N.Y. 2013) ("Both the ADA and the FHA allow for reasonable accommodation claims." (citing *Quad Enterprises Co., LLC v. Town of Southold*, 369 F. App'x 202, 205 (2d Cir. 2010))).

Kentucky law also makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a housing accommodation to any buyer or renter because of a disability of . . . [t]hat buyer or renter."  KRS § 344.360(9).  And because Kentucky's own discrimination statute "mirrors the FHA," courts apply the same standard to disability discrimination claims arising under Kentucky law, the FHA, and the ADA.  *See Lexington-Fayette Urban Cnty. Human Rights Comm'n v. Bradford Green, LLC*, No. 2018-CA-000132-MR, 2019 WL 1579602, *2 (Ky. Ct. App. Apr. 12, 2019) (citations omitted); *McKee v. Sanders Rentals, LLC*, NO. 2017-CA-000931-MR, 2018 WL 5778787, *3 (Ky. Ct. App. Nov. 2, 2018) (citations omitted).

Under both state and federal law, a plaintiff must demonstrate the following elements in order to succeed on a disability discrimination claim for failure to accommodate: (1) the plaintiff suffers from a disability; (2) the defendant knew or reasonably should have known of the disability; (3) the requested accommodation may be necessary to afford an equal opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable; and (5) the defendant refused to make the accommodation.  *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 (6th Cir. 2011) (citation omitted); *see also Hollis v. Chesnut Bend Homeowner's Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014).   Reasonable accommodation claims under the FHA do not require proof of discriminatory intent.  *Hollis*, 760 F.3d at 540.

As explained, Plaintiff claims Defendants discriminated against him when they denied two requests for accommodation: (1) to allow his emotional support dog to be off leash on LMHA

property and common areas during his recovery from upcoming surgery; and (2) to allow him to transfer to a single-family housing unit.  [R. 1; R. 1-1].  On the record currently before the Court, Plaintiff cannot demonstrate a likelihood of success on the merits or on appeal for his failure-to-accommodate claim for either request, as explained below.

### a.  Request to Keep Dog Off-Leash

As noted above, the requested accommodation must be reasonable.  "To determine the reasonableness of the requested modification, the burden that the requested modification would impose on the defendant (and perhaps on persons or interests whom the defendant represents) must be weighed against the benefits that would accrue to the plaintiff."  *Hollis*, 760 F.3d at 541; s*ee also Whiteaker v. City of Southgate*, --- F. Supp. 3d ---, No. 22-10011, 2023 WL 317457, at *3 (E.D. Mich. Jan. 19, 2023) (to determine reasonableness, "the Court must weigh the burden the requested accommodation would place on the defendant against the benefits the accommodation will provide the plaintiff.").

Here, as the record confirms, LMHA denied Plaintiff's unreasonable request to keep his dog off its leash based on the documented aggressive history of the dog.  *See* [R. 15-6].  Housing Authority policy required animals to be maintained on a leash unless given a reasonable accommodation waiver.  The record indicates that Plaintiff's off-leash request was unreasonable because the dog had a documented history of aggression toward other residents, LMHA staff, and other animals.[16]  [R. 15-1; R. 15-3; R. 9-1, pp. 20, 23].  One incident allegedly involved a pregnant tenant where "Mr. Ali's [unleashed] dog ran knocking her down."  [R. 9-1, p. 23].  The police and animal control were called.  Further, this resident stated such aggression by Mr. Ali's dog had happened twice.  *Id.*

---

[16] The Court makes this finding even if it assumes Plaintiff's first request for accommodation to be supported by a doctor's note.  [R. 15-2, p. 2].

- 17 -

LMHA general counsel explained the reasoned denial of Plaintiff's request in his letter dated April 29, 2022: "Your support animal has a documented history of aggressive behavior toward LMHA residents and staff as well as other animals.  Allowing you to keep the animal off leash would violate local ordinance and pose an unacceptable risk of harm to others."  [R. 15-6, p. 2].  The letter concluded: "LMHA wants to work with you collaboratively to identify potential alternative accommodations to meet needs.  If you are interested, please contact me to arrange a meeting for this purpose."  *Id.*  The record does not reveal that Plaintiff ever requested such a meeting.

The record is undisputed that Plaintiff allowed his dog to be off leash in the common areas in violation of local ordinances and his agreements with LMHA and that his off-leash dog had multiple instances of aggression toward other residents and dogs.  Given the documented safety concerns, the burden posed by Plaintiff's requested accommodation outweighed any benefits.  Therefore, Plaintiff cannot satisfy the reasonable element of his failure-to-accommodate claim.

### b.  Request for Transfer

As for the request to transfer, LMHA arranged for Plaintiff to transfer to a different single-member unit, which he did not accept. Plaintiff then requested a single-*family* unit with two bedrooms.  [R. 15-4, pp. 1–2].  Because Plaintiff, as a single individual, did not qualify for family housing with two bedrooms (and no one-bedroom houses were available), LMHA agreed to such a transfer subject to Plaintiff providing a physician's certification or letter verifying the transfer was medically necessary.  [R. 9-1, p. 14; R. 15-4, p. 1; R. 15-5, p. 1].  Plaintiff acknowledges that he sought such verification, but his physician refused to provide it, without additional information from Plaintiff.  [R. 15-5, p. 1].  The record reflects Plaintiff failed to follow up with his physician and never secured the physician letter.  LMHA general counsel thoroughly explained this denial

to Plaintiff in the April 29, 2022 letter: "LMHA is willing to arrange your immediate transfer to another scattered site housing location as soon as a suitable unit becomes available." [R. 15-6, pp. 1–2]. Counsel explained, "Unfortunately, there is an issue with your request for a single-family unit [because] LMHA only has single-family units with two bedrooms or more. As the sole member of your household, you currently do not qualify for a two-bedroom unit." *Id.* LMHA counsel further explained it could only place him in a two-bedroom, single-family unit "if you can provide a doctor's statement that it was necessary to accommodate your disability." *Id.* at 2. In the absence of such information, LMHA could only offer transfer to a one-bedroom unit. *Id.* The record reflects Plaintiff never followed up with LMHA regarding the accommodation request and did not provide the required doctor's statement; he also did not accept transfer to a one-bedroom unit. *Id.*; *see also* [R. 15, pp. 3, 8].

To prevail on his failure-to-accommodate claim, Plaintiff must demonstrate that the requested accommodation was necessary to afford him an equal opportunity to use and enjoy his dwelling. *Overlook Mut. Homes*, 415 F. App'x at 621 (citation omitted). In other words, he must show that, "but for the accommodation, [he] likely will be denied an equal opportunity to enjoy the housing of [his] choice." *Anderson v. City of Blue Ash*, 798 F.3d 338, 361 (6th Cir. 2015) (quoting *Smith & Lee Assocs. v. City of Taylor, Mich.*, 102 F.3d 781, 795 (6th Cir. 1996)) (internal quotation marks omitted). In this sense, the necessity element is "a causation inquiry that examines whether the requested accommodation or modification would redress injuries that otherwise prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive." *Id.* (quoting *Hollis*, 760 F.3d at 541) (internal quotation marks omitted).

Importantly, a housing provider is entitled to request information to evaluate whether a requested accommodation may be necessary. *See Overlook Mut. Homes*, 415 F. App'x at 621 ("A

- 19 -

housing provider . . . is entitled to seek information from an alleged disabled person in order to establish the existence of the disability and the necessity of the accommodation.").[17]   Here, however, the record is clear that, despite LMHA's repeated requests, Plaintiff never provided LMHA with a doctor's notice to substantiate that this requested accommodation was necessary to provide him equal use and enjoyment of his home.  As a result, his is unlikely to succeed on the merits of an appeal with respect to his failure-to-accommodate claim relating to his request for a two-bedroom unit.

With respect to Plaintiff's request to transfer, the Court also finds that the fifth element of a failure-to-accommodate claim is unsatisfied. That final element requires that the defendant refused to make the accommodation.  *See Overlook Mut. Homes*, 415 F. App'x at 621 (citation omitted).  But here, there is no evidence that Defendants refused to provide a two-bedroom unit for Plaintiff, actually or constructively.   In an April 29, 2022 letter, LMHA general counsel explained to Plaintiff that, in order to transfer him to a two-bedroom unit, LMHA needed "a doctor's statement that it was necessary to accommodate your disability."   [R. 15-6, p. 2]. Otherwise, LMHA could only offer transfer to a one-bedroom unit.  *Id.*  According to Defendants, Plaintiff never followed up with LMHA regarding the accommodation request and did not provide the required doctor's statement; he also did not accept transfer to a one-bedroom unit.  *See* [R. 15, pp. 3, 8].  Simply put, there is no evidence that LMHA refused to consider Plaintiff's request for a two-bedroom unit; instead, LMHA "merely requested additional, appropriate information from

_____

[17] In *Overlook Mutual Homes*, the Sixth Circuit cited to a Joint Statement by HUD and the Department of Justice. The Court explained that while the Joint Statement was not an authoritative interpretation of the FHA, it was persuasive.  415 F. App'x at 621 n.3.  This Court agrees. That Joint Statement, titled "Reasonable Accommodations Under the Fair Housing Act" and published on May 14, 2004, remains on the Department of Justice website and was updated as recently as June 9, 2023.  *See* Joint Statement of the Dept. of Housing and Urban Development and the Dept. of Justice, *Reasonable Accommodations Under the Fair Housing Act*, May 14 (2004) (updated June 9, 2023), https://www.justice.gov/crt/us-department-housing-and-urban-development.

[Plaintiff] and his treating physicians," as it was permitted to do under the law. *Prindable v. Assoc. of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1260 (D. Hi. 2003) (evaluating "refusal" factor under FHA failure-to-accommodate claim where the plaintiff failed to provide the requested verification documents from his physician). Plaintiff failed to provide that information. Further, there is no evidence whatsoever that, had LMHA received the proper documentation from a medical professional, it would have denied Plaintiff's request for a two-bedroom unit. "Until an accommodation request is denied, there is no discrimination under" the FHA. *Id.* at 1258 (citations omitted). Plaintiff has therefore failed to demonstrate a likelihood of success on appeal related to the merits of his discrimination claim based on failure to accommodate his request for transfer.[18]

### 2. Failure to Engage in the Interactive Process

Plaintiff also alleges that the defendants failed to engage in an interactive process in violation of the FHA. *See* [R. 1-1, p. 9]. However, neither the text of the FHA, as amended, or its regulations reference an "interactive process." *See Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1192 (9th Cir. 2021). As other courts facing similar "failure to engage" claims have explained, "[t]he statute makes clear when liability attaches" and the courts "lack the authority to expand the basis for liability adopted by Congress." *Id.* "[A]t its heart, the [FHA, as amended] does not forbid a landlord from failing to engage with a tenant requesting an accommodation that

---

[18] The Court notes that Plaintiff made one other allegation concerning his request for a two-bedroom house. He alludes to discrimination because "there are numerous single individuals on the property at 2903 Six Mile Lane who occupy two bedroom apartments without any indication of medical needs." [R. 15-5, p. 1]. The Court notes that Plaintiff failed to provide any specifics (or meat on the bones) of this allegation. Further, during the telephonic status conference on July 6, 2023, defense counsel explained that even if the Court accepted this unsupported allegation, there are wholly permissible reasons why a single individual might end up in a two bedroom unit, for instance, where two or more people originally resided in the unit, but one or more passed away, left due to divorce or college, and so on. Even if the Court accepted Plaintiff's unsubstantiated allegation concerning other unnamed residents, Plaintiff has failed to meet his burden on demonstrating likelihood of success on appeal.

has no basis in law or fact." *Id.*  Thus, while the FHA prohibits a landlord from failing to make reasonable accommodations, it does not prohibit failing to engage in an interactive process.  *Id.*

However, the Court understands that Plaintiff may have intended to cite to the ADA's requirement that employers initiate an informal and interactive process with an employee who has requested an accommodation.  *See Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (citations omitted).  Under those circumstances, the ADA requires an interactive process involving communication and a good-faith exploration of potential accommodations, and, importantly, both parties have a duty to participate in good faith.  *Id.* (citation omitted).  Even assuming that this requirement applies to a housing discrimination claim like Plaintiff's, his claim necessarily fails.  Here, the record is replete with documentation showing LMHA sought in good faith to engage Plaintiff in an interactive process concerning his accommodation requests for over a year and only brought eviction proceedings after new allegations arose that Plaintiff threatened LMHA staff.  *See* [R. 37-2]; *Louisville Metro Housing Authority v. Ali*, No. 23-C-006649 (Jefferson Dist. Ct. May 23, 2023) (Petition for Writ of Forcible Detainer).  For example, Defendant Kelly and LMHA provided Plaintiff with reasonable accommodation forms; agreed to transfer him to another unit as soon as one was available; explained that no one-bedroom single family units were available at the time; advised him what would be required for the two-bedroom family unit he requested (a doctor's notice); and otherwise continually offered assistance to Plaintiff.  [R. 9-1, p. 14; R. 15-5, p. 1]; *see also* [R. 15-4].  In one letter, the defendants stated, "LMHA wants to work with you collaboratively to identify potential alternative accommodations to meet needs.  If you are interested, please contact me to arrange a meeting for this purpose." [R. 15-6, p. 2].  And despite these offers of help, the record does not reveal that Plaintiff availed himself of such assistance.  He accordingly has shown no likelihood of success on the merits for

any claim based on a failure to engage in an interactive process.  *See generally Kleiber*, 485 F.3d at 871 (discussing consequences of failing to engage in the process).

### 3.  Retaliation

Plaintiff next alleges that the defendants retaliated against him in violation of federal and state law.  *See* [R. 1-1, p. 10 (citing the KCRA and FHA)].  Specifically, he alleges Defendants retaliated against him for requesting a reasonable accommodation and failing to engage in the interactive process, and by creating a hostile living environment.  *Id.*  In his original Motion for Temporary Restraining Order and Preliminary Injunction, [R. 9], Plaintiff also claims Defendants retaliated against him for filing a HUD claim against Defendants and purportedly for filing this federal action.  [R. 9, pp. 15–16].

Under the Fair Housing Act, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, . . . any right granted or protected by" the FHA.  42 U.S.C. § 3617.  The KCRA also make it unlawful to "retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter."  KRS § 344.280(1).  And though not cited by the plaintiff, the ADA similarly prohibits retaliation against an individual that "opposes any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a)(b).

Under these federal and state laws, "[t]he essence of a retaliation claim . . . is that the plaintiff engaged in conduct protected by statute, the defendant took an adverse action against the plaintiff, and this adverse action was taken at least in part because of the protected conduct."  *Vance v. City of Maumee*, 960 F. Supp. 2d 720, 734 (N.D. Ohio 2013); *see also Thaddeus-X v. Blatter*,

175 F.3d 378, 386–87 (6th Cir. 1999) (explaining that retaliation claims may arise under various bodies of statutory law, "but the essential framework stays the same" (citations omitted)); *Lexington Fayette Urban Cnty. Human Rights Commission v. Whaley*, NO. 2020-CA-1465-MR, NO. 2020-CA-1537-MR, 2022 WL 2182752, *5 (Ky. Ct. App. June 17, 2022) (explaining that retaliation claims under the KCRA are interpreted consistent with federal law and a plaintiff must show that they engaged in a protected activity, the exercise of which was known to the defendant, who then took an action materially adverse to the plaintiff, and there exists a causal connection between the protected activity and the materially adverse action).

Here, Plaintiff cannot establish a causal connection between any protected activity on his part and any action taken against him by LMHA.  In fact, nothing on this record remotely suggests that Defendants retaliated against Plaintiff for seeking an accommodation or for filing a complaint against LMHA with HUD.  First, as explained above, Plaintiff's requested accommodations were unreasonable, and there is simply no evidence in the record that Defendant's denial was premised on Plaintiff's HUD complaint or the current lawsuit. Of note, the issues with Plaintiff's unleashed and aggressive dog, and Defendant's explanation concerning the issues with Plaintiff's two-bedroom housing request, *predated* his HUD complaint (filed on May 2, 2022) and the filing of this action.  [R 1-2].  Plaintiff has failed to link any protected activity with the denial of his requests for accommodation or his ultimate eviction.

Instead, the record shows that Defendants' initial letters to Plaintiff outlining LMHA's eviction rights related to Plaintiff's refusal to recertify his eligibility for housing, which was expressly required by his lease and federal regulations and required of all tenants.  LMHA repeatedly and consistently (for nearly a year) asked Plaintiff to sign recertification documents.  Despite this clear requirement and months and months of extensions for Plaintiff to comply,

Defendants only took steps to obtain a forcible detainer judgment after Plaintiff allegedly threatened a LMHA employee.  [R. 34; R. 37-2]; *see also See Louisville Metro Housing Authority v. Ali*, No. 23-C-006649 (Jefferson Dist. Ct. May 23, 2023) (Petition for Writ of Forcible Detainer).[19]  Thus, Plaintiff cannot demonstrate a likelihood of success on the merits for any retaliation claim either.[20]

### 4.  Unlawful Business Practices

Lastly, Plaintiff alleges a claim for "unlawful business practices" in violation of federal and state law.  *See* [R. 1-1, p. 11 (citing KRS § 367.110 and 42 U.S.C. § 3601)].  For this claim, Plaintiff alleges that:

> Defendants have committed unlawful and unfair business practices, including but not limited to the following: (1) failing to reasonably accommodate Plaintiff; (2) failing to engage in a timely, good faith, interactive process to determine effective reasonable accommodations for a resident with a disability; (3) retaliating against Plaintiff for exercising his rights under the law; and (4) retaliating against Plaintiff on the basis of disability.

[R. 1-1, p. 12, ¶63].  Notably, these "facts" simply restate the prior causes of action Plaintiff has already alleged, meaning this claim fails for the same reasons.

### C.  Public Interest and Potential Harm to Others

Finally, the Court briefly observes that the remaining factors also do not support Plaintiff's request for a stay.  The Court understands that the public "has an interest in 'guaranteeing that

---

[19] Again, the Court observes that the writ of forcible detainer was filed three weeks after defense counsel sought to inform Magistrate Judge Edwards of an alleged death threat Plaintiff made against an LMHA employee.  *See* [R. 34].  During the telephonic status conference on July 6, 2023, defense counsel listed four reasons LMHA sought to evict Plaintiff: (1) threatening behavior against a LMHA employee; (2) failure to pay rent in more than a year; (3) failure to complete the recertification process; and (4) failure to permit individuals in his home to make repairs.  *See generally* [R. 39]; *Louisville Metro Housing Authority v. Ali*, No. 23-C-006649 (Jefferson Dist. Ct. May 23, 2023) (Petition for Writ of Forcible Detainer).

[20] For these same reasons, Plaintiff has failed to demonstrate a likelihood of success on appeal related to his unsupported allegation that defendants created a hostile living environment.  [R. 1-7].

those in financial need are not unreasonably terminated from public assistance benefits,'" like Section 8 housing. *Watkins v. Green Metropolitan Housing Authority*, 397 F.Supp.3d 1103, 1110 (S.D. Ohio 2019) (quoting *Jones v. Lansing Hous. Comm'n*, No. 5:03-CV-123, 2003 WL 26118817, *8 (W.D. Mich. Sept. 19, 2003)). Here, however, the evidence of record indicates that Plaintiff's termination was not unreasonable, particularly in light of the multitude of reasons supporting his eviction. *See supra*, section I.B., p. 10, n.9; *Louisville Metro Housing Authority v. Ali*, No. 23-C-006649 (Jefferson Dist. Ct. May 23, 2023) (Petition for Writ of Forcible Detainer). Moreover, LMHA undoubtedly has an interest in recipients of public housing complying with conditions of their lease, particularly relating to safety and to certifications to ensure that only those who qualify receive public housing. And while there is of course a public interest in protecting disabled individuals from discrimination, there is no evidence of any such discrimination in this case, as explained above, nor is there any evidence of harm to third parties. Simply put, Plaintiff has provided the Court with no information to suggest any harm to third parties or that the public interest warrants his requested relief. Thus, upon consideration of all the factors, the Court finds Plaintiff's requested stay is not warranted.

## IV.     Conclusion

For the foregoing reasons, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Plaintiff's Motion to Supplement Emergency Motion for Injunctive Relief [**R. 40**] is **GRANTED**.

2. Plaintiff's Emergency Motion for Injunction Pending Appeal [**R. 37**] is **DENIED**.

3. Plaintiff's Motion for Preliminary Injunction [**R. 23**] is **DENIED as moot**.

4.  Plaintiff's Motion for Leave to File a Supplemental Complaint [**R. 12**] and Motion for Amended Complaint [**R. 35**] are **ADMINISTRATIVELY REMANDED** pending resolution of Plaintiff's appeal.  Plaintiff may file a motion to reinstate those motions, if desired, after his appeal is resolved.

This the 17th day of July, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY